The TORRINGTON COMPANY, Plaintiff,

Federal–Mogul Corporation, Plaintiff–Intervenor,

v.

UNITED STATES, Defendant,

NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation and NTN Corporation; Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A.; Peer Bearing Company; NSK Ltd. and NSK Corporation; Minebea Co., Ltd. and NMB Corporation; and Caterpillar Inc., Defendant–Intervenors.

Court No. 91–08–00569.

United States Court of International Trade.

March 29, 1993.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., Geert De Prest, Margaret E.O. Edozien, John M. Breen, Lane S. Hurewitz, Patrick J. McDonough, Robert A. Weaver and Amy S. Dwyer, Washington, DC, for plaintiff The Torrington Co.

Frederick L. Ikenson, P.C., Frederick L. Ikenson, J. Eric Nissley and Joseph A. Perna, V, Washington, DC, for plaintiff-intervenor Federal–Mogul Corp.

Stuart E. Schiffer, Acting Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Velta A. Melnbrencis and Jane E. Meehan, of counsel: John D. McInerny, Acting Deputy Chief Counsel for Import Admin., Dean A. Pinkert and Stephen J. Claeys, Attorney–Advisors, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, DC, for defendant.

Powell, Goldstein, Frazer & Murphy, Peter O. Suchman, Neil R. Ellis, Susan E. Silver, T. George Davis and Niall P. Meagher, Washington, DC, for defendant-intervenor Koyo Seiko Co., Ltd. and Koyo Corp. of U.S.A.

Powell, Goldstein, Frazer & Murphy, Richard M. Belanger, Neil R. Ellis and D. Christine Wood, Washington, DC, for defendant-intervenor Caterpillar, Inc.

Tanaka Ritger & Middleton, H. William Tanaka, Michele N. Tanaka and Michael J. Brown, Washington, DC, for defendant-intervenor Minebea Co., Ltd. and NMB Corp.

Barnes, Richardson & Colburn, Robert E. Burke, Donald J. Unger, Kazumune V. Kano and Diane A. MacDonald, Chicago, IL, for defendant-intervenor NTN Bearing Corp. of America, American NTN Bearing Mfg. Corp. and NTN Corp.

Coudert Brothers, Robert A. Lipstein, Matthew P. Jaffe and Nathan V. Holt, Washington, DC, for defendant-intervenor NSK Ltd. and NSK Corp.

Venable, Baetjer, Howard & Civiletti, John M. Gurley, Washington, DC, for defendant-intervenor Peer Bearing Co.

## OPINION

TSOUCALAS, Judge:

Plaintiff, The Torrington Company ("Torrington"), commenced this action to challenge certain aspects of the Department of Commerce, International Trade Administration's ("ITA") final results in the first administrative review of imports of antifriction bearings from Japan. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From Japan; Final Results of Antidumping Duty Administrative Reviews ("Final Results")*, 56 Fed.Reg. 31,754 (1991). Substantive issues raised by the parties in the underlying administrative proceeding

were addressed by the ITA in the issues appendix to *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany; Final Results of Antidumping Duty Administrative Review ("Issues Appendix")*, 56 Fed.Reg. 31,692 (1991).

Defendant-intervenors, Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. ("Koyo"), now move pursuant to Rule 56.1 of the Rules of this Court for partial judgment on the agency record in regard to certain claims which may affect Koyo raised by Torrington in its challenge to certain aspects of the ITA's Final Results.

### Background

On June 11, 1990, the ITA initiated an administrative review of imports of ball bearings, cylindrical roller bearings, spherical plain bearings and parts thereof from Japan. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts Thereof From the Federal Republic of Germany, France, Italy, Japan, Romania, Singapore, Sweden, Thailand and the United Kingdom Initiation of Antidumping Administrative Reviews*, 55 Fed.Reg. 23,575 (1990).

On March 15, 1991, the ITA published its preliminary determination in the administrative review. *Antifriction Bearings (Other Than Tapered Roller Bearings) and Parts thereof from Japan; Preliminary Results of Antidumping Duty Administrative Reviews and Partial Termination of Antidumping Duty Administrative Reviews ("Preliminary Results")*, 56 Fed.Reg. 11,186 (1991). In the Preliminary Results, the ITA calculated that Koyo's margin for ball bearings was 0.49% and Koyo's margin for cylindrical roller bearings was 0.02%. Koyo had no sales of spherical plain bearings during the period of review. *Preliminary Results*, 56 Fed.Reg. at 11,189.

On July 11, 1991, the ITA published its Final Results in this proceeding. *Final Results*, 56 Fed.Reg. 31,754. The ITA calculated margins of 9.82% for Koyo's ball bearings and 1.45% for Koyo's cylindrical roller bearings. *Id.* at 31,756.

A decision by this Court on some of the issues raised by Torrington may have an impact on the dumping margin calculated for defendant-intervenor Koyo.

Torrington has challenged the following actions by the ITA which may impact Koyo's dumping margin alleging that these actions were unsupported by substantial evidence on the administrative record and not in accordance with law: the ITA's (1) use of a methodology for adjusting United States price ("USP")[1] and Foreign Market Value ("FMV")[2] for the Japanese value added tax

---

1. Purchase price and exporter's sales price ("ESP") are the two types of United States price. USP, purchase price and ESP are defined at 19 U.S.C. § 1677a (1988):

 **(a) United States price**
 [T]he term "United States price" means the purchase price, or the exporter's sales price, of the merchandise, whichever is appropriate.
 **(b) Purchase price**
 "[P]urchase price" means the price at which merchandise is purchased, or agreed to be purchased, prior to the date of importation, from a reseller or the manufacturer or producer of the merchandise for exportation to the United States.
 **(c) Exporter's sales price**
 "[E]xporter's sales price" means the price at which merchandise is sold or agreed to be sold in the United States, before or after the time of importation, by or for the account of the exporter....
 The purchase price is normally used as USP where the transaction prior to importation is between unrelated parties, or at arm's length. The exporter's sales price will be used as the USP when the U.S. importer and the foreign seller are "related parties." *See* 19 U.S.C. § 1677(13) (1988). The exporter's sales price will be the price at which the merchandise is first sold to an unrelated purchaser in the United States. 19 U.S.C. § 1677a(c).

2. In an administrative review, the ITA is required to calculate "the [FMV] and [USP] of each entry of merchandise subject to the antidumping duty order" and determine "the amount, if any, by which the [FMV] of each such entry exceeds the [USP] of the entry." 19 U.S.C. § 1675(a)(2) (1988).

 19 U.S.C. § 1677b(a) (1988) defines FMV:
 **(1) In general**
 The foreign market value of imported merchandise shall be the price, ...
 (A) at which such or similar merchandise is sold ... in the principal markets of the country from which exported ..., or
 (B) if not sold or offered for sale for home consumption, ... then the price at which so sold or offered for sale for exportation to countries other than the United States,
 ....

("VAT") that granted a circumstance of sale ("COS") adjustment to FMV to achieve tax neutrality; (2) method of calculating cash deposit rates for estimated duties; (3) treatment of antifriction bearings imported into foreign trade zones ("FTZ"); (4) treatment of antifriction bearings imported by related parties and re-exported; (5) in regard to exporter sales price ("ESP") transactions, allowance of an adjustment to FMV for inventory carrying costs; (6) allowance of an adjustment to FMV for alleged post sale price adjustments and rebates; and (7) calculation of the adjustment for home market credit costs for Koyo Seiko Co., Ltd. *Plaintiff's Response to Defendant-intervenors' Motion for Judgment on the Agency Record ("Torrington's Response")* at 22–69.

## Discussion

This Court's jurisdiction over this matter is derived from 19 U.S.C. § 1516a(a)(2) (1988) and 28 U.S.C. § 1581(c) (1988).

A final determination by the ITA in an administrative proceeding will be sustained unless that determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *Alhambra Foundry Co. v. United States*, 12 CIT 343, 345, 685 F.Supp. 1252, 1255 (1988).

1. *Circumstance of Sale Adjustment to FMV for Value Added Tax*

■ At issue here is the ITA's treatment of the Japanese VAT pursuant to 19 U.S.C. § 1677a(d)(1)(C) (1988) which states:

**(d) Adjustments to purchase price and exporter's sales price**

The purchase price and the exporter's sales price shall be adjusted by being—

 (1) increased by—

. . . . .

 (C) the amount of any taxes imposed in the country of exportation directly upon the exported merchandise or components thereof, which have been rebated, or which have not been collected, by reason of the exportation of the merchandise to the United States, but only to the extent that such taxes are added to or included in the price of such or similar merchandise when sold in the country of exportation; ....

In the Final Results, the ITA explained its treatment of VATs as follows:

We calculated the addition to USP by applying the [home market] tax rate to the net U.S. price after all other adjustments were made. This imputed tax amount is BIA, because HM sales were reported net of VAT, and we are thus unable to determine what the home market tax base was.

....

Because all HM sales were reported net of VAT, we added the same VAT amount to FMV as that calculated for USP. This is equivalent to calculating the actual HM tax, and then performing a circumstance-of-sale adjustment to FMV to eliminate the absolute difference between the amount of tax in each market.

*Issues Appendix*, 56 Fed.Reg. at 31,729.

NSK Ltd. and NSK Corporation ("NSK") argue that the statute does not require that FMV contain home market excise taxes and that in situations, as here, where FMV is reported net tax no adjustment need be made to FMV. *Memorandum of Points and Authorities in Support of Koyo's Motion for Judgment on the Agency Record ("NSK's Memorandum")* at 26–32.

This Court does not agree. The plain language of 19 U.S.C. § 1677a(d)(1)(C) requires that USP be increased by the amount of any indirect tax imposed on sales of the subject merchandise in the home market, regardless of whether FMV is reported net tax or not. *Zenith Elecs. Corp. v. United States*, 10 CIT 268, 275–82, 633 F.Supp. 1382, 1388–94 (1986), *appeal dismissed*, 875 F.2d 291 (Fed.Cir.1989). Clearly the statute anticipates a comparison between FMV and USP with indirect taxes included in both prices. Therefore, in cases such as this where FMV is reported net tax, it is necessary for the ITA to add the indirect tax back into FMV. The question before this Court is whether the ITA should add the full amount

of VAT paid on a home market sale back into FMV or only add an amount equal to the adjustment made to USP pursuant to 19 U.S.C. § 1677a(d)(1)(C) in order to maintain tax neutrality.

In its treatment of the Japanese VAT the ITA tried to achieve tax neutrality by eliminating the absolute difference between the VAT amount paid on a home market sale and the addition for the Japanese VAT made to the comparable U.S. sale price by making a circumstance of sale adjustment to FMV pursuant to 19 U.S.C. § 1677b(a)(4)(B) (1988).[3] The ITA explained its methodology in the Final Results as follows:

> Because all HM sales were reported net of VAT, we added the same VAT amount to FMV as that calculated for USP. This is equivalent to calculating the actual HM tax, and then performing a circumstance-of-sale adjustment to FMV to eliminate the absolute difference between the amount of tax in each market.

*Issues Appendix,* 56 Fed.Reg. at 31,729.

ITA believes that the General Agreement on Tariffs and Trade ("GATT") requires the ITA to calculate tax neutral dumping margins.[4] *Defendant's Memorandum in Response to the Motion of Defendant-intervenors, Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A., for Judgment upon the Agency Record ("Defendant's Response")* at 51–54.

ITA also believes that 19 U.S.C. § 1677b(a)(4)(B) gives the ITA broad author-ity to grant COS adjustments and "that differences in taxation are essentially no different than any other difference in expenses between the two markets" and therefore qualify for a COS adjustment. *Id.* at 42–43. In support of its contention that the ITA has broad authority to make COS adjustments to achieve tax neutrality, the ITA relies upon *Smith–Corona Group v. United States,* 713 F.2d 1568 (Fed.Cir.1983), *cert. denied,* 465 U.S. 1022, 104 S.Ct. 1274, 79 L.Ed.2d 679 (1984). *Defendant's Response* at 44–47. Koyo, NSK and NTN Bearing Corporation of America, American NTN Bearing Manufacturing Corporation and NTN Corporation ("NTN") essentially agree with the ITA's position. *Memorandum of Points and Authorities in Support of Defendant-intervenors' Motion for Judgment on the Agency Record ("Koyo's Memorandum")* at 34–44; *Defendant-intervenors' Reply to Plaintiff's Response to Defendant-intervenors' Motion for Judgment on the Agency Record ("Koyo's Reply")* at 15–21; *Reply Brief of Defendant-intervenor NTN Bearing Corporation of America, American NTN Bearing Corporation, and NTN Corporation ("NTN's Reply")* at 7–20; *NSK's Response* at 32–35.

In *Smith–Corona* the ITA used 19 U.S.C. § 1677b(a)(4)(B) to grant an "exporter's sales price offset" to FMV for adjustments to ESP for indirect costs. The language of 19 U.S.C. § 1677b(a)(4)(B) had been interpreted to allow only COS adjustments for "direct costs." The Court of Appeals for the Federal Circuit

---

3. 19 U.S.C. § 1677b(a)(4)(B) states in relevant part:

 **(4) Other adjustments**
 In determining foreign market value, if it is established to the satisfaction of the administering authority that the amount of any difference between the United States price and the foreign market value (or that the fact that the United States price is the same as the foreign market value) is wholly or partly due to—

 . . . . .

 (B) other differences in circumstances of sale; or

 . . . . .

 then due allowance shall be made therefor. *See also* 19 C.F.R. § 353.56(a) (1991).

4. Article VI (4) of the GATT states:
 No product of the territory of any contracting party imported into the territory of any other contracting party shall be subject to anti-dumping or countervailing duty by reason of the exemption of such product from duties or taxes borne by the like product when destined for consumption in the country of origin or exportation, or by reason of the refund of such duties or taxes.
 General Agreement on Tariffs and Trade, *opened for signature* Oct. 30, 1947, 61 Stat. (5), (6), T.I.A.S. No. 1700, 55 U.N.T.S. 187 (1948).
 Article 2, paragraph 6, of the GATT Antidumping Code states:
 In order to effect a fair comparison between the export price and the domestic price in the exporting country ... [d]ue allowance shall be made in each case, on its merits, for the differences in conditions and terms of sale, for the differences in taxation, and for the other differences affecting price comparability.
 Article 2(6) of the Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade, *opened for signature* April 12, 1979, 31 U.S.T. 4920, 4926 (1981).

found that the ITA has broad authority to grant COS adjustments pursuant to 19 U.S.C. § 1677b(a)(4)(B) and that a COS adjustment to offset the adjustment to ESP for indirect costs was necessary "to guarantee that the administering authority makes the fair value comparison on a fair basis—comparing apples with apples" even though the adjustment is not being made for direct costs. *Smith–Corona,* 713 F.2d at 1578.

Torrington argues that the antidumping duty statute does not require or permit adjustments for commodity taxes to be made in a way which achieves tax neutrality and that while the ITA's methodology may be tax neutral it is not dumping margin neutral. *Torrington's Response* at 44–46.

This Court has fully addressed these arguments and adheres to its decision on this issue in *Federal–Mogul Corp. v. United States,* 17 CIT ——, —— – ——, 813 F.Supp. 856, 862–865 (1993). This Court remands this issue to the ITA to allow the ITA to add the full amount of VAT paid on home market sales to FMV without adjustment in conformity with this Court's remand instructions in *Federal–Mogul,* 17 CIT at ——, 813 F.Supp. at 873.

2. *Calculation of Cash Deposit Rates*

■ In this administrative review, the ITA used two different methodologies for the actual calculation of the dumping margins in cases where ESP sales were used: one for assessing duties on entries covered by the review, and the other for setting the cash deposit rate on future entries of the subject merchandise. *Final Results,* 56 Fed.Reg. at 31,756–57; *Issues Appendix,* 56 Fed.Reg. at 31,698–702. To calculate the assessment rate for ESP sales, the ITA "divide[d] the total PUDD [potential uncollected dumping duties—calculated as the total difference between foreign market value and U.S. price for an exporter] for the reviewed sales by the *total entered value* of those reviewed sales...." *Issues Appendix,* 56 Fed.Reg. at 31,698–99 (emphasis added). To calculate the estimated cash deposit rate for ESP sales, the ITA "divided the total PUDD for each exporter by the *total net U.S. price* for that exporter's sales...." *Id.* at 31,699 (emphasis added).

Torrington argues that the ITA's use of a methodology which results in an estimated cash deposit rate different from the assessment duty rate was unsupported by substantial evidence on the record and not in accordance with law. *Torrington's Response* at 22–30. Specifically, Torrington contends that since the cash deposit rate is applied to the entered value of future entries, the ITA's policy of calculating this rate as a percentage of statutory USP rather than as a percentage of the entered value results in an under collection of cash deposits on future entries. *Id.* at 22–23.

In order to avoid this under collection, Torrington suggests that a more accurate method for calculating the deposit rate is to represent the antidumping duty as a percentage of the entry's entered value. This is the method that the ITA used for calculating the assessment rate. *Id.*

Among other arguments, the defendant, Koyo and NSK contend that there is no statute or case law requiring the cash deposit rate to equal the duty assessment rate. *Defendant's Response* at 9–10; *Koyo's Memorandum* at 25; *NSK's Memorandum* at 15–16. Moreover, the defendant and Koyo argue that the ITA is not required to use an identical methodology for computing both assessment rates and cash deposit rates. *Defendant's Response* at 6–7; *Koyo's Memorandum* at 25–27.

This Court has fully addressed these arguments and adheres to its decision on this issue in *Federal–Mogul Corp.,* 17 CIT at —— – ——, 813 F.Supp. at 866–868. Therefore, this Court finds that the methodology used by the ITA in this review is reasonable and in accordance with law. *See also Zenith Elecs. Corp. v. United States,* 15 CIT 394, ——, 770 F.Supp. 648, 655 (1991); *Daewoo Elecs. Co. v. United States,* 13 CIT 253, 283, 712 F.Supp. 931, 957 (1989).

3. *Treatment of Antifriction Bearings Imported into Foreign Trade Zones*

■ Torrington challenges the ITA's treatment of antifriction bearings ("AFBs") imported into the U.S. through foreign trade zones.

Section 81b of Title 19, United States Code, provides authority for the Secretary of Commerce to set up foreign trade zones ("FTZ") at U.S. ports of entry. This process is supervised by the Foreign Trade Zones Board and the U.S. Customs Service ("Customs"). 19 U.S.C. § 81b (1988). Pursuant to the statute, merchandise brought into a FTZ may be exempt from U.S. customs laws. The relevant provisions of 19 U.S.C. § 81c(a) (1988) state:

(a) **Handling of merchandise in zone; shipment of foreign merchandise into customs territory; appraisal; reshipment to zone**

Foreign and domestic merchandise of every description, except such as is prohibited by law, may, *without being subject to the customs laws of the United States,* except as otherwise provided in this chapter, be brought into a zone and may be ... mixed with foreign or domestic merchandise, or otherwise manipulated, or be manufactured except as otherwise provided in this chapter, and be exported, destroyed, or sent into customs territory of the United States therefrom, in the original package or otherwise; *but when foreign merchandise is so sent from a zone into customs territory of the United States it shall be subject to the laws and regulations of the United States affecting imported merchandise: Provided,* That whenever the privilege shall be requested and there has been no manipulation or manufacture effecting a change in tariff classification, the appropriate customs officer shall take under supervision any lot or part of a lot of foreign merchandise in a zone, cause it to be appraised and taxes determined and

duties liquidated thereon. Merchandise so taken under supervision may be ... manufactured under the supervision and regulations prescribed by the Secretary of the Treasury, and whether mixed or manufactured with domestic merchandise or not may, under regulations prescribed by the Secretary of the Treasury, be exported or destroyed, or may be sent into customs territory upon the payment of such liquidated duties and determined taxes thereon.

(Emphasis added).

In the Final Results the ITA included all imports of AFBs from FTZs which entered U.S. Customs territory as AFBs in its calculation of dumping margins but concluded that:

To the extent that any sales of the subject merchandise were admitted into a FTZ and transformed into merchandise not covered by these orders (e.g., automobiles) before entry into U.S. Customs territory, the Department currently has no basis for the assessment of antidumping duties on the merchandise.

*Issues Appendix,* 56 Fed.Reg. at 31,704.

Torrington alleges that the ITA's failure to require the deposit of estimated antidumping duties upon import of antifriction bearings into FTZs and the failure to require importers to elect "privileged"[5] status for imports of such merchandise was not in accordance with law. *Torrington's Response* at 30–42.

Torrington argues that the focus of antidumping duty orders is on importation of subject merchandise and that importation occurs when the AFBs enter the geographic

---

5. Pursuant to 19 U.S.C. § 81c(a), the U.S. Customs Service has promulgated regulations regarding the operation of FTZs.

Upon entry of merchandise into a FTZ, an importer may elect to have the merchandise classified as "privileged foreign status" or "nonprivileged foreign status" merchandise. 19 C.F.R. § 146.41 (1991) governs application for "privileged foreign status" and states in pertinent part:

§ 146.41 Privileged foreign status.

(a) *General.* Foreign merchandise which has not been manipulated or manufactured so as to effect a change in tariff classification will be given status as privileged foreign merchandise on proper application to the district director.

All other foreign merchandise brought into a FTZ is given "nonprivileged foreign status." *See* 19 C.F.R. § 146.42 (1991).

19 C.F.R. § 146.65(a) (1991) governs classification and valuation of foreign merchandise in a FTZ and states that privileged foreign merchandise "will be subject to tariff classification according to its character, condition and quantity, at the rate of duty and tax in force on the date of filing ... [of] the application for privileged status" and that nonprivileged foreign merchandise "will be subject to tariff classification in accordance with its character, condition and quantity as constructively transferred to Customs territory at the time the entry or entry summary is filed with Customs."

U.S. and not on when the merchandise is formally entered into the U.S. Customs territory. *Id.* at 38–39.[6] In addition, Torrington points out that foreign merchandise within a FTZ is considered imported for purposes of all U.S. laws except "the customs laws of the United States." *See* 19 U.S.C. § 81c(a). Torrington argues that the antidumping duty statute is not part of the customs laws of the United States. *Torrington's Response* at 33, 39. Therefore, the ITA should be required to order Customs to require the deposit of estimated antidumping duties upon the importation of AFBs into all FTZs.

Torrington also argues that the ITA was wrong in not requiring importers of AFBs to elect privileged status for their imports into FTZs. By requiring the election of privileged status, AFBs incorporated into merchandise not covered by these antidumping duty orders would still be subject to assessment of antidumping duties upon entry into the U.S. Customs territory and liquidation of the new merchandise which includes the subject AFBs. *Id.* at 33–34. Torrington states that the ITA implicitly agrees with its position because the Foreign Trade Zone Board, in conjunction with the ITA, had proposed regulations which would require importers of merchandise which is subject to an antidumping duty order into a FTZ to elect privileged status for the merchandise. *Id.; see* 15 C.F.R. § 400.33(b) (1992) (entered into force April 6, 1992).

The defendant and Koyo respond to Torrington's arguments by pointing out that the discussion of importation cited by Torrington as the focus of antidumping duty orders is contained at 19 U.S.C. § 1673 which refers specifically to less-than-fair-value and injury determinations and does not address the conduct of administrative reviews or the deposit of antidumping duties. *Defendant's Response* at 14–15; *Koyo's Memorandum* at 22; *Koyo's Reply* at 11–13.

The defendant, Koyo and NSK argue that 19 U.S.C. § 1675(a) (1988) governs the conduct of administrative reviews and requires the ITA to determine

(A) the foreign market value and United States price of each *entry* of merchandise subject to the antidumping duty order and included within that determination, and

(B) the amount, if any, by which the foreign market value of each such *entry* exceeds the United States price of the *entry.*

19 U.S.C. § 1675(a)(2) (emphasis added). The defendant, Koyo and NSK argue that the term entry is a term of art used in the Tariff Act of 1930, as amended, which includes the antidumping duty statute and various other customs laws, that the term "entry" in its broadest sense includes the transactions necessary to secure the release of merchandise from Customs' control and that this occurs when goods are transferred into the Customs territory of the U.S. *Defendant's Response* at 17–18; *Koyo's Memorandum* at 20–23; *Koyo's Reply* at 11–12; *NSK's Memorandum* at 21–22; *cf. Defendant-intervenor Caterpillar Inc.'s Memorandum of Points and Authorities in Support of the Motion of Koyo Seiko Co. Ltd. for Judgment on the Agency Record ("Caterpillar's Memorandum")* at 6–9; *see also Oxford Univ. Press, Inc. v. United States,* 29 Cust. Ct. 191, 196, C.D. 1467 (1952), *aff'd,* 33 Cust. Ct. 479, Abs. 58,636 (1954), *reh'g denied,* 34 Cust.Ct. 301, Abs. 58,807 (1955); 19 U.S.C. § 1484 (1988); 19 C.F.R. § 141.62 (1991).

Additionally, the defendant and defendant-intervenors Koyo, NTN, NSK and Caterpillar Inc. ("Caterpillar") argue that merchandise in a FTZ only becomes "subject to the laws and regulations of the United States affecting imported merchandise" when the merchandise "is [ ] sent from a zone into customs territory of the United States" and

---

**6.** Torrington cites to 19 U.S.C. § 1673 (1988) which states:

 If—

 (1) the administering authority determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value, and

 (2) the Commission determines that—

 (A) an industry in the United States—

 (i) is materially injured, or

 (ii) is threatened with material injury, or

 (B) the establishment of an industry in the United States is materially retarded,

 by reason of *imports* of that merchandise or by reason of sales (or the likelihood of sales) of that merchandise for *importation,*

 then there shall be imposed upon such merchandise an antidumping duty. . . .

 (Emphasis added).

that the antidumping duty statute is clearly a "law[] ... of the United States affecting imported merchandise." *Defendant's Response* at 18–19 (*citing* 19 U.S.C. § 81c(a)); *Koyo's Memorandum* at 20–22; *Koyo's Reply* at 10; *NTN's Reply* at 7; *NSK's Memorandum* at 19–21; *Caterpillar's Memorandum* at 5. Therefore, the ITA was correct in not requiring the posting of estimated antidumping duties upon importation of AFBs into FTZs.

In regard to Torrington's argument that the ITA should require importers to elect privileged status for their imports of AFBS into FTZs, the defendant, Koyo, NSK and Caterpillar argue that, at the time of the importation of the AFBs subject to this administrative review there was no statute or regulation which authorized the ITA to impose antidumping duties on merchandise entered into the U.S. Customs territory which incorporated AFBs which, standing alone, would have been subject to antidumping duties. While the defendant admits that the new regulation found at 15 C.F.R. § 400.-33(b) will require all future entries of merchandise subject to an antidumping or countervailing duty order to receive privileged status, the defendant, Koyo, NSK and Caterpillar point out that this regulation was not in effect at the time of the entries at issue here and indeed did not come into effect until nine months after the publication of the Final Results in this administrative review. *Defendant's Memorandum* at 24–27; *Koyo's Memorandum* at 23; *Koyo's Reply* at 14–15; *NSK's Memorandum* at 22–25; *Caterpillar's Memorandum* at 9–12.

Finally, the defendant argues that requiring AFB imports into FTZs to be classified as privileged foreign merchandise would not have changed the ITA's treatment of those AFBs which were incorporated into automobiles in a FTZ and then entered into the U.S. Customs territory. This is because the ITA has a long standing policy of deeming imports of merchandise containing products subject to an outstanding antidumping duty order, which covered parts comprise an insig-

nificant amount by value of the finished article, as outside the scope of the antidumping duty order. *Defendant's Memorandum* at 20–27.[7]

In interpreting the Foreign Trade Zone statute Torrington has focused on the phrase "without being subject to the customs laws of the United States" arguing that the antidumping duty statute is not part of the U.S. customs laws. By doing so Torrington ignores the phrase "but when foreign merchandise is so sent from a zone into the customs territory of the United States it shall be subject to the laws and regulations affecting imported merchandise." 19 U.S.C. § 81c(a). This Court finds that it is unnecessary to determine whether the antidumping duty statute is or is not a part of the U.S. customs law because it is absolutely clear that the antidumping duty statue is a "law ... affecting imported merchandise." *Id.* Therefore, this Court finds that the Foreign Trade Zone statute on its face exempts foreign merchandise within a FTZ from the imposition of antidumping duties until that merchandise is brought into the U.S. Customs territory, unless some other provision of the Foreign Trade Zone statute or the regulations promulgated pursuant to that law require otherwise.

At the time of the imports in question the only way that antidumping duties could be applied to foreign merchandise within a FTZ was if that merchandise was declared privileged pursuant to 19 C.F.R. § 146.41. While it is true that the FTZ Board has required such a declaration in granting applications for the creation or modification of a zone in the past, this Court finds no support for the contention that the ITA was *required* to request the FTZ board, or that the FTZ board was required on its own initiative, to impose such restrictions on all preexisting FTZs. Therefore, this Court finds that *at the time of the imports in question* there was no statute or regulation that required that antidumping duties be imposed on merchandise imported into a FTZ until such time as the

---

7. In the Final Results the ITA stated:

The Department considers those AFBs otherwise subject to these orders that are incorporated into non-AFB products, which collectively comprise less than one percent of the value

of the finished products sold to unrelated customers in the United States, to be outside the scope of the antidumping orders on AFBs and not subject to antidumping duty assessments. *Issues Appendix,* 56 Fed.Reg. at 31,702.

merchandise enters the Customs territory of the U.S.[8]

In addition, there is no reason to believe that the use of the term entry in the antidumping duty statute refers to anything other than formal entry of merchandise into the U.S. Customs territory. The antidumping duty statute is part of the Tariff Act of 1930, as amended, as are the regular customs laws of the U.S. which define entry as the process of filing documentation with Customs to allow Customs to determine whether the subject merchandise should be released from Customs' custody and, if so, what duties are due. 19 U.S.C. § 1484(a). This process occurs when merchandise formally enters the U.S. Customs territory. In the case of imports going through a FTZ, this occurs when the merchandise leaves the FTZ and enters the U.S. Customs territory.

Finally, 19 U.S.C. § 1673e(a)(3) (1988) "requires the deposit of estimated antidumping duties pending liquidation of entries of merchandise *at the same time* as estimated normal customs duties on that merchandise are deposited." (Emphasis added). In terms of merchandise inside a FTZ, the deposit of normal customs duties, and therefore the deposit of estimated antidumping duties, occurs when the merchandise is entered into the U.S. Customs territory unless the merchandise has been declared privileged. In this case this Court has already determined that there was no requirement that the imports in question be declared privileged, therefore deposits of estimated antidumping duties were due upon entry of the merchandise into the U.S. Customs territory.

### 4. *Re-exports*

■ Torrington alleges that the ITA's failure to assess antidumping duties on AFBs imported by a related party in the United States and re-exported to a third country without a sale occurring in the United States was not in accordance with law. *Torrington's Response* at 66–68.

Specifically, Torrington argues that assessment of, and liability for, the payment of, antidumping duties occurs upon importation,

or at the latest, entry of the subject merchandise and is made on the basis of a comparison of the FMV and USP of each entry. Therefore, the relevant transaction for calculating the assessment of antidumping duties occurs upon importation or, at the latest, upon entry of the goods. *Torrington's Response* at 66–67.

Torrington attempts to find support for its position by pointing out that Congress eliminated duty drawback with respect to antidumping duties paid on imported merchandise, incorporated into U.S. products and subsequently exported. 19 U.S.C. § 1677h (1988). Torrington also points out that the ITA agreed with and followed this position in *Tapered Roller Bearings Four Inches or Less in Outside diameter From Japan; Final Results of Antidumping Duty Administrative Review,* 55 Fed.Reg. 22,369, 22,377 (1990). *Torrington's Response* at 67–68.

Torrington suggests that the ITA could overcome the lack of a USP due to the lack of a U.S. sale by using "best information available" based on adjusted resale price, other transaction margins, the margin from another time period, or the transfer price between the related parties. *Id.* at 68.

In the Final Results at issue here, the ITA rejected Torrington's argument by pointing out that in order for assessment of antidumping duties to take place, a sale must occur in the U.S. and that no U.S. sale has occurred in the case of the re-exported AFBs at issue here. *Issues Appendix,* 56 Fed.Reg. at 31,-743; *Defendant's Memorandum* at 71–72; *see also Koyo's Memorandum* at 53–55; *Koyo's Reply* at 35–37; *NTN's Reply* at 26–29.

The defendant and NTN argue that antidumping duties are imposed "in an amount equal to the amount by which the foreign market value exceeds the United States price for the merchandise" yet here there is no USP. 19 U.S.C. § 1673; *see also* 19 U.S.C. § 1675(a); *Defendant's Memorandum* at 71; *NTN's Reply* at 26–27.

---

**8.** The Court finds that the parties' discussion of 15 C.F.R. § 400.33(b) is irrelevant to deciding the issues raised in this case since this regulation did not take effect until well after importation of

the merchandise in question occurred and in fact almost nine months after the administrative review at issue here was completed.

The defendant, Koyo and NTN point out that USP is defined as purchase price or exporter's sales price. 19 U.S.C. § 1677a(a). In the situation at issue here, where the only U.S. transaction is between related parties, purchase price can not apply because purchase price is the price agreed to between two unrelated parties prior to importation of the merchandise into the U.S. 19 U.S.C. § 1677a(b). Exporter's sales price also cannot be used because it is the price at which the merchandise is sold or agreed to be sold to an unrelated party in the U.S. 19 U.S.C. § 1677a(c). As a result, in this situation there is no USP to be compared to FMV and, therefore, antidumping duties cannot be assessed on AFBs re-exported by a related party without a U.S. sale. *Defendant's Memorandum* at 71–72; *Koyo's Reply* at 35–36; *NTN's Reply* at 26–27.

Further, the defendant and NTN argue that the purpose of the antidumping duty statute is to provide a remedy to U.S. industries which have been injured by reason of sales of foreign merchandise in the U.S. at less-than-fair-value. If there has been no sale in the U.S., then no U.S. industry has been injured by reason of the sale of the imports in question. *Defendant's Memorandum* at 74–75; *NTN's Reply* at 27–28.

Finally, the defendant and Koyo point out that an agency may change its prior practice if the agency determines that its earlier practice was in conflict with the statute citing *Citrosuco Paulista, S.A. v. United States*, 12 CIT 1196, 1209, 704 F.Supp. 1075, 1088 (1988). *Defendant's Memorandum* at 75; *Koyo's Reply* at 36–37.

This Court finds that there is no basis in the statute for the assessment of antidumping duties on imports to the U.S. of the subject merchandise by related parties which are subsequently re-exported without a sale occurring in the U.S. The purpose and clear meaning of the language of the antidumping duty statute requires that there be some meaningful sale to, or in, the U.S. market which can be compared to FMV to derive the dumping margin. *See* 19 U.S.C. §§ 1673, 1675(a)(2), 1677a. No such sales have occurred here and no dumping margin can be calculated. Also, it is impossible to meet the statutory requirement that, in order to assess antidumping duties, a U.S. industry must be injured by imports if these imports are never sold in the U.S. market.

Therefore, this Court finds that the ITA's treatment of AFBs imported into the U.S. by related parties and subsequently re-exported without sale in the U.S. was in accordance with law and is affirmed.

## 5. *Inventory Carrying Costs*

■ In the Final Results of this administrative review the ITA correctly adjusted ESP for imputed inventory carrying costs pursuant to 19 U.S.C. § 1677a(e)(2) (1988). Torrington does not challenge this adjustment.

Pursuant to its new administrative practice, the ITA also made a corresponding adjustment to FMV for imputed inventory carrying costs when comparing ESP sales to FMV sales. The ITA explained its reasoning as follows:

The Department adjusts for inventory carrying costs on U.S. sales through imputation because the actual financial cost, for the time between shipment from the parent and payment by the related importer, is generally borne by the foreign parent. Therefore, the cost will not be found on the books of the importer, but submerged in the accounts of the parent with other financial costs. As a result, some of the selling expenses associated with the U.S. sales are not directly identifiable. Similarly, in the home market, although the actual cost of carrying inventory is on the books of the seller, it will be commingled with all other interest expenses, and classified as a general and administrative expense rather than as a selling expense. As is the case for the U.S. sales, the actual amount is not identifiable. Therefore, it is appropriate to impute this cost in both markets, since the nature of the expense is the same, and the same difficulty exists in determining the actual costs in each market.

*Issues Appendix*, 56 Fed.Reg. at 31,727.

Torrington objects to this adjustment by the ITA to FMV for imputed inventory carrying costs. Torrington argues that the expense of carrying inventory in the home market "is a general and administrative expense,

allocable to world-wide bearing sales and not identifiable as a 'difference' in circumstances of sale." *Torrington's Response* at 51. Torrington points out that adjustments to FMV pursuant to 19 U.S.C. § 1677b(a)(4)(B) are only allowed for price differences which result from differences in circumstances of sale. Torrington argues that the costs of inventory administration were not listed in the statute, regulations or legislative history and are not differences in circumstances of sale for which an adjustment is allowed. *Id.* at 52–53.

Torrington argues that, to the extent that home market related party distributors incurred inventory carrying costs, the ITA would already have adjusted FMV for these expenses deeming them to be direct selling expenses. Therefore, any additional deduction from FMV for imputed inventory carrying costs could unjustifiably double-count the adjustment. *Id.* at 53–54.

Torrington also argues that the ITA's methodology for granting adjustments to FMV for imputed inventory carrying costs impermissibly grants such adjustments without requiring any substantiation by the respondents. *Id.* at 54 (*citing Timken Co. v. United States*, 10 CIT 86, 98, 630 F.Supp. 1327, 1338 (1986)).

Finally, Torrington points out that the ITA's longstanding practice in regard to this issue was to deny an adjustment to FMV for imputed inventory carrying costs. *Torrington's Response* at 51–52 (*citing Antidumping; Malleable Cast Iron Pipe Fittings, Other Than Grooved, From Brazil; Final Determination of Sales at Less Than Fair Value*, 51 Fed.Reg. 10,897 (1986); *Final Determination of Sales at Less Than Fair Value; Certain Valves, Couplings, Nozzles and Connections of Brass, Suitable for Use in Interior Fire Protection Systems, From Italy*, 49 Fed.Reg. 47,066 (1984); *Kraft Condenser Paper From Finland; Final Results of Administrative Review of Antidumping Finding*, 47 Fed.Reg. 3,813 (1982)). Torrington also argues that this past practice by the ITA was specifically sanctioned by this court in *Daewoo*, 13 CIT at 274, 712 F.Supp. at 950. *Torrington's Response* at 54–55.

Defendant admits that the ITA has changed its administrative practice in regard to the treatment of home market pre-sale inventory costs. The defendant states that since 1987 the ITA has calculated inventory carrying costs from the date of production of merchandise destined for sale in both markets instead of the date of shipment. As a result, the ITA now believes that there are "pre-sale" inventory carrying costs in both markets which should be adjusted for in order to obtain an "apple with apple" comparison. *Defendant's Memorandum* at 60–62.

The ITA had always considered "post-sale" inventory carrying costs to be indirect selling expenses subject to adjustment via the ESP offset.[9] Since the ITA has determined that the correct point for comparing FMV and USP and for determining what costs can be adjusted for is at the point of production, it follows that all home market post-production inventory costs are now subject to the ESP offset. It is on this basis that the adjustment to FMV for imputed inventory carrying costs was made in this review. *Id.; cf. NSK's Memorandum* at 35–36.

Defendant argues that the *Daewoo* case is inapplicable to this case because the *Daewoo* court's decision was premised on the belief that there was no pre-sale inventory carrying expense in the home market which is comparable to the imputed inventory carrying expense for ESP sales. Defendant states that the ITA now believes that there are comparable inventory carrying costs in both markets which should be adjusted for. *Defendant's Memorandum* at 59–62.

Koyo and NSK argue that *Daewoo* is inapplicable to this case because the *Daewoo* court only found that the ITA is *not required* to make an adjustment to FMV for pre-sale inventory carrying costs, not that such an adjustment is not allowed. *Koyo's Reply* at 22–24; *NSK's Memorandum* at 37–38.

The defendant also argues that because these inventory carrying costs are carried on a company's books as general and administrative expenses does not mean that they are not indirect selling expenses subject to the

---

9. *See supra* discussion of ESP offset at pp. 1568– 69, and 19 C.F.R. § 353.56(b)(2) (1991).

ESP offset. *Defendant's Memorandum* at 63–64.

Koyo points out that it makes no sense for Torrington to suggest that inventory carrying costs in ESP transactions are selling expenses but that the same type of expenses in the home market are not. *Koyo's Reply* at 24.

Koyo also argues that the court in *Daewoo* sanctioned the ITA's methodology for imputing inventory carrying costs for ESP transactions and that the same method was used in this review. In addition, Koyo points out that Torrington presents no evidence that the ITA's imputation of expenses was incorrect. *Koyo's Reply* at 25–26 (*citing Daewoo*, 13 CIT at 274, 712 F.Supp. at 950).

Finally, the defendant and Koyo argue that Torrington has presented no evidence on the administrative record to show that double-counting of inventory carrying costs has occurred. *Defendant's Memorandum* at 64; *Koyo's Reply* at 24–25.

The ITA has a longstanding administrative practice, when comparing FMV and ESP sales, of adjusting FMV for indirect selling expenses subject to a cap in an amount equal to the adjustment for indirect selling expenses allowed for ESP sales. 19 C.F.R. § 353.56(b)(2). This so-called "ESP offset" was upheld by the U.S. Court of Appeals for the Federal Circuit in *Smith–Corona*, 713 F.2d at 1577–79.

This Court finds that pre-sale home market inventory carrying costs are indirect selling expenses which can be adjusted for subject to the ESP offset. 19 C.F.R. § 353.-56(b)(2). It is clear, and Torrington does not dispute this finding, that inventory carrying costs related to ESP transactions are indirect selling expenses for which adjustment to ESP may be made pursuant to 19 U.S.C. § 1677a(e)(2). It is common sense that the same type of indirect selling expenses may occur in regard to home market sales *when* merchandise is held in inventory. The real question is how to measure the expense.

The antidumping duty statute requires that during an administrative review, the ITA determine the difference in price between a sale of the subject merchandise in the home market to an unrelated party and a contemporaneous sale of the subject merchandise in the United States to an unrelated party. 19 U.S.C. §§ 1675(a)(2), 1677a, 1677b. The intent, and the ITA's practice, is to try to remove certain expenses to derive a FMV price and a USP price at a comparable point in the stream of commerce. 19 U.S.C. §§ 1677a(d)–(e), 1677b(a); *Smith–Corona*, 713 F.2d at 1571–72. This is to achieve the goal of having a so-called "apples with apples" price comparison.

When dealing with a specific expense such as inventory carrying costs, the key is for the ITA to determine the amount of the expense for each FMV and ESP sale by measuring the expense beginning at a common point in the stream of commerce at which point FMV merchandise and ESP merchandise have not yet been differentiated (i.e., in this case, the time of production of the merchandise) through the time of the sale of the merchandise to an unrelated party.

In this administrative review, the ITA followed its current administrative practice of measuring inventory carrying costs from the date of production. As long as the ITA is consistent in making its measurements in regard to FMV and ESP sales, this Court finds nothing wrong with this method of measuring such expenses.

In regard to the court's opinion in *Daewoo*, this Court finds that the situation facing the *Daewoo* court was substantially different from the situation presented here. In *Daewoo*, the ITA measured the amount of the adjustment for inventory carrying costs from the date of shipment of the goods to an unrelated buyer. In a home market sales situation, FMV would be adjusted only for any post-sale inventory carrying costs. Due to the ITA's choice of the point of reference for measuring inventory carrying costs, pre-sale inventory carrying costs were not subject to adjustment. The *Daewoo* court simply found that, given the ITA's point of reference for measuring such expenses, there was no requirement that the ITA make an adjustment to FMV for pre-sale inventory carrying costs. *Daewoo*, 13 CIT at 274, 712 F.Supp. at 950. In this case, the ITA has changed its point of reference and, in order to make a fair comparison, adjusts for all inventory carrying costs incurred for both FMV and ESP

sales after production of the merchandise. Given its new point of reference for measuring inventory carrying costs, the ITA was correct to include home market inventory carrying costs incurred after the time of production of the merchandise as part of the pool of indirect selling expenses for which adjustment to FMV can be made subject to 19 C.F.R. § 353.56(b)(2) in those situations where AFBs produced for the home market were held in inventory.

Therefore, this Court finds that the ITA's adjustment to FMV for imputed inventory carrying costs pursuant to 19 C.F.R. § 353.-56(b)(2) was a reasonable exercise of the ITA's discretion in implementing the antidumping duty statute and is affirmed.

Finally, Torrington has presented *no* evidence that double-counting of inventory carrying costs has occurred and, therefore, this Court declines to reach this issue. *See Asociacion Colombiana de Exportadores v. United States*, 13 CIT 13, 19 n. 8, 704 F.Supp. 1114, 1120 n. 8 (1989), *aff'd on other grounds*, 901 F.2d 1084 (Fed.Cir.1990), *cert. denied*, 498 U.S. 848, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990).

6. *Post-sale Price Adjustments and Rebates*

 Torrington challenges the grant by the ITA to Koyo and NTN of an adjustment to FMV for post-sale price adjustments ("PSPAs") and rebates. *Torrington's Response* at 55–61.

In the Final Results of this administrative review, the ITA stated that in regard to PSPAs and rebates:

> The Department generally allows adjustments to home market price and USP for discounts and rebates where respondents have granted and paid them on sales of subject merchandise to unrelated parties during the period of review. Such discounts or rebates should be part of a respondent's standard business practice and not intended to avoid potential antidumping duty liability. The Department generally makes an adjustment if discounts and rebates, granted pursuant to accurately and adequately described programs, are properly reported on a sale or customer-specific basis and are directly associated with the products or sales under consideration.
>
> . . . .
>
> Koyo: The adjustments claimed by Koyo are allowable because they are customary and an ordinary part of its business practices. Koyo determines these adjustments on a product-specific basis but aggregates them for bookkeeping purposes. Because they were allocated on neither a product-specific nor a customer-specific basis, we treated them as indirect selling expenses.
>
> . . . .
>
> NTN: At verification, NTN demonstrated to the Department's satisfaction that its rebates were tied to sales of the subject merchandise, and that it granted rebates during the period of review for sales made during the period of review. Because it is the Department's practice to treat post-sale price adjustments as rebates where they are granted as a standard business practice, we have deducted the amount of the rebate from FMV.

*Issues Appendix*, 56 Fed.Reg. at 31,717–18.

Torrington argues that the ITA abdicated its responsibility by allowing the respondents to propose a methodology for calculating average price adjustments on a customer-specific basis, and allowing the respondents to do the actual calculations. *Torrington's Response* at 60–61 (*citing Timken*, 10 CIT at 98, 630 F.Supp. at 1338). Torrington also argues that Koyo and NTN incorrectly included PSPAs and rebates paid on non-scope merchandise in their calculations. *Torrington's Response* at 55–57. Torrington alleges that the administrative record shows that both Koyo and NTN had the necessary information to calculate product-specific PSPAs and rebates. *Id.* at 56–57. Finally, Torrington argues that the ITA should not have granted adjustments for PSPAs and rebates as indirect selling expenses if the respondents had the necessary information to calculate these adjustments as direct price adjustments. *Id.* at 60–61.

Defendant argues that given the enormous number of sales transactions involved in this administrative review and the fact that the vast majority of them involved PSPAs or

rebates, coupled with the fact that PSPAs and rebates were not always recorded on a product-specific basis, the methodology proposed by the respondents and accepted by the ITA to calculate an average PSPA or rebate per customer and apply that average to sales of the subject merchandise was reasonable. *Defendant's Memorandum* at 66–67; *cf. Koyo's Reply* at 28. Defendant points out that the calculation of the average adjustments per customer was based on actual aggregate PSPAs and rebates paid to each customer. *Defendant's Memorandum* at 67.

Defendant and Koyo argue that the ITA's use of a methodology which includes non-scope merchandise in calculating customer-specific PSPAs and rebates was approved by the U.S. Court of Appeals for the Federal Circuit in *Smith–Corona*, 713 F.2d at 1579–81. *Defendant's Memorandum* at 67; *Koyo's Reply* at 28–30. In addition, NTN points out that Torrington presents no evidence that the inclusion of non-scope merchandise in these calculations had any impact on the calculation of NTN's reported rebate percentage. *NTN's Reply* at 25.

The defendant, Koyo and NTN also point out that Koyo and NTN provided the ITA with detailed information on their claimed PSPAs and rebates and that the ITA verified this information for both respondents. *Defendant's Memorandum* at 67; *Koyo's Reply* at 30; *NTN's Reply* at 25.

Finally, the defendant points out that this Court has already upheld the ITA's grant of an indirect selling expense adjustment to Koyo's FMV for PSPAs and rebates in *Koyo Seiko Co. v. United States*, 16 CIT ——, —— – ——, 796 F.Supp. 1526, 1529–30 (1992). *Defendant's Memorandum* at 68.

The Court begins by noting that the decision in *Koyo Seiko Co.*, 16 CIT at —— – ——, 796 F.Supp. at 1529–30, only affirmed the ITA's decision to treat Koyo's PSPAs and rebates as indirect selling expenses and did not address the overall validity of the methodology used by the ITA in calculating adjustments to FMV for Koyo and NTN's PSPAs and rebates.

This administrative review entailed the calculation of dumping margins for a huge number of sales of AFBs, many of which involved PSPAs and rebates. In order to complete these reviews in a timely fashion, some use of sampling and averaging had to occur. The antidumping duty statute grants the ITA authority to use valid sampling and averaging techniques. 19 U.S.C. § 1677f–1 (1988). Nothing in the statute prevents the ITA from using averaging methodologies proposed by respondents as long as the ITA finds that the methods used "shall be representative of the transactions under investigation" and the data used is verified by the ITA as accurate. 19 U.S.C. §§ 1677e, 1677f–1(b) (1988). In this case, the ITA verified the data used by Koyo and NTN to calculate claimed adjustments for PSPAs and rebates. Administrative Record Japan Public Documents ("AR Jap.Pub.Docs.") 659, 724.

However, this Court finds that the defendant and Koyo have misinterpreted the U.S. Court of Appeals for the Federal Circuit's decision in *Smith–Corona*, 713 F.2d at 1579–81. In *Smith–Corona*, the methodology approved by the court involved

comput[ing] the ratio of the total sales amount of [in-scope merchandise] to the total sales amount of all merchandise subject to the rebate program. This ratio, multiplied by the total amount of rebate paid, yields the total amount of rebate paid for [in-scope merchandise] sales.

713 F.2d at 1579–80. Therefore, in *Smith–Corona*, rebates on out of scope merchandise were not included in the final calculation of the customer-specific PSPAs and rebates used in calculating actual dumping margins. *Id.*

Merchandise which is outside the scope of an antidumping duty order cannot be used in the calculation of antidumping duties. 19 U.S.C. § 1675(a)(2); *see Badger–Powhatan v. United States*, 10 CIT 241, 633 F.Supp. 1364, *appeal dismissed*, 808 F.2d 823 (Fed. Cir.1986).

In this administrative review it is clear from the administrative record that PSPAs and rebates on sales of out of scope merchandise were used to calculate the adjustment to FMV for PSPAs and rebates. It is also clear that no effort was made to eliminate PSPAs and rebates paid on out of scope merchandise. This may have been accomplished by calculating the amount of in-scope merchan-

dise sold to each customer as a percentage of total sales to that customer and applying this percentage to the total amount of PSPAs and rebates paid to that customer during the period of review to arrive at a total amount of PSPAs and rebates paid to that customer on sales of in scope merchandise within the period of review.

While, as discussed above, the ITA has a large amount of discretion in developing and accepting averaging and sampling techniques, this Court cannot allow the ITA to use a methodology which allows for the inclusion of PSPAs and rebates on out of scope merchandise in calculating adjustments to FMV and ultimately the dumping margins. Therefore, this Court remands this issue to the ITA to allow the ITA to develop a methodology which removes PSPAs and rebates paid on sales of out of scope merchandise from any adjustments made to FMV for PSPAs or rebates or, if no viable method can be developed, to deny such an adjustment in its calculation of FMV.

### 7. *Koyo's Home Market Credit Costs*

■ The final issue which Torrington raises in this proceeding is the ITA's acceptance of Koyo's proposed methodology for calculating and Koyo's calculation of home market credit costs.

For purposes of this administrative review, Koyo calculated customer-specific credit days outstanding for its fifty-three largest ball bearing customers and thirty-two largest cylindrical roller bearing customers. This represented well over half of Koyo's home market sales of both types of bearings during the period of review. For its remaining customers, Koyo calculated a weight-averaged number of credit days outstanding using the information derived from its largest customers. AR Jap.Pub.Doc. 340.

In the Final Results of this administrative review, the ITA addressed this issue by stating:

The Department prefers to have credit calculated on a transaction-by-transaction basis. However, given the massive number of transactions in these reviews, we consider calculations based on average credit days outstanding on a customer-specific basis to be reasonable. We veri-

fied that ... Koyo based [its] home market credit amounts on a customer-specific average. This methodology takes into account different actual payment periods extended to different customers....

We also used Koyo['s] ... credit costs, as reported, for these final results. Although credit expenses for ... some of Koyo's sales were not calculated on a sale-specific or customer-specific basis, we have accepted the reported credit costs as the best information otherwise available in this review; however, with respect to the reporting of credit expense, this review is an exception to ordinary Department practice. In the future, in keeping with Department practice, credit expenses should be reported, at a minimum, on a customer-specific basis. In fact, the Department's preference remains sales-specific reporting of this expense.

*Issues Appendix,* 56 Fed.Reg. at 31,724.

Once again Torrington argues that the ITA abdicated its responsibility by allowing Koyo to propose a methodology for calculating credit costs and by allowing Koyo to do the actual calculations. *Torrington's Response* at 61–65 (*citing Timken,* 10 CIT at 98, 630 F.Supp. at 1338). Torrington alleges, and Koyo agrees, that Koyo's methodology was not random. *Torrington's Response* at 64; *Koyo's Memorandum* at 47. Therefore, Torrington argues that the methodology cannot be truly representative and should not have been accepted by the ITA. *Torrington's Response* at 64–65. Torrington also argues that even though the ITA verified Koyo's methodology and data, this does not prove that the results provided information representative of a transaction-by-transaction analysis and, therefore, should not have been accepted by the ITA. *Id.* at 65.

In support of its position, Torrington argues that in *Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Certain Components Thereof, From Japan; Final Results of Antidumping Duty Administrative Review* ("*Tapered Roller Bearings*"), 56 Fed.Reg. 26,054 (1991), the ITA rejected Koyo's proposed methodology for calculating credit costs as not representative. *Torrington's Response* at 64–65. In *Tapered*

*Roller Bearings,* Koyo used a maximum and a minimum number of days outstanding per customer to calculate the average days outstanding for each of its twenty largest customers. 56 Fed.Reg. at 26,058. The ITA rejected Koyo's approach as unrepresentative. *Id.* Torrington argues that the same logic applies to Koyo's proposed methodology in this administrative review. *Torrington's Response* at 65.

> Defendant argues that
> it was clearly reasonable for Commerce to accept Koyo's credit calculations based upon the average credit days outstanding on a customer-specific basis, particularly when Commerce could verify that the home market credit amounts were customer-specific averages. As to those credit costs which were not calculated on a sale-specific or customer-specific basis, Commerce properly accepted them as best information available.

*Defendant's Memorandum* at 69.

Koyo argues that given the enormous number of sales used and high percentage of customers represented in its calculation of credit expenses, there is no basis for Torrington to allege that the data supplied by Koyo was skewed or unrepresentative. *Koyo's Reply* at 33. In addition, Koyo points out that the ITA verified the data provided by Koyo as accurate and then accepted Koyo's methodology as a representative sample of Koyo's home market credit costs. *Koyo's Reply* at 34.

Koyo also points out that the methodology rejected by the ITA in *Tapered Roller Bearings,* 56 Fed.Reg. at 26,058, differs in many important respects from the methodology used in this administrative review. Koyo states that in subsequent tapered roller bearing administrative reviews the ITA has accepted the same methodology as used in this review. *Koyo's Reply* at 33–34 *(citing Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, From Japan; Final Results of Antidumping Duty Administrative Review,* 57 Fed.Reg. 4,975, 4,982 (1992) and *Tapered Roller Bearings, and Parts Thereof, Finished and Unfinished, From Japan; Final Results of Antidumping Duty Administrative Review,* 57 Fed.Reg. 4,960, 4,967–68 (1992)).

This Court finds that the methodology proposed by Koyo and accepted by the ITA to calculate Koyo's home market credit costs was reasonable given the circumstances of this case. Once again, it bears pointing out that the ITA was faced with calculating dumping margins for hundreds of thousands of sales transactions in this review within tight time limits. The use of various sampling and averaging techniques was required to meet these deadlines and the ITA has authority to do so pursuant to 19 U.S.C. § 1677f–1.

Simply because the ITA accepted a respondent's proposed methodology for calculating credit costs does not mean that the ITA has transferred control of the administrative review to the respondent. This conclusion is especially true in a situation where, as here, the ITA verified the underlying data upon which Koyo's credit costs were calculated. AR Jap.Pub.Doc. 659.

Therefore, this Court finds that the methodology used by the ITA in this review to calculate Koyo's home market credit costs may not be absolutely perfect, or possibly the best method the ITA could have used, but it is a reasonable method which is well within the ITA's discretion to use pursuant to 19 U.S.C. § 1677f–1 and is, therefore, in accordance with law and supported by the administrative record.

Given that this Court has found that the ITA's use of home market credit costs calculated and submitted by Koyo on a customer-specific basis was in accordance with law and supported by evidence on the administrative record, this Court also finds that the ITA's decision to use this information as best information available in regard to home market credit costs not supplied on a customer-specific basis is also in accordance with law and supported by evidence on the administrative record. *See Chemical Prods. Corp. v. United States,* 10 CIT 626, 632–34, 645 F.Supp. 289, 294–96, *remand order vacated,* 10 CIT 819, 651 F.Supp. 1449 (1986) (ITA has broad discretion in its choice of best information available).

## Conclusion

In accordance with the foregoing opinion, this case is remanded to the ITA to add the

full amount of VAT paid on each sale in the home market to FMV without adjustment and to develop a methodology which removes PSPAs and rebates paid on sales of out of scope merchandise from any adjustment made to FMV for PSPAs and rebates, or to deny an adjustment if a viable method cannot be found. ITA's determination is affirmed in all other respects. Remand results are due within ninety (90) days of the date this opinion is entered. Any comments or responses by the parties to the remand results are due within thirty (30) days thereafter. Any rebuttal comments are due within fifteen (15) days of the date responses or comments are due.

## ORDER

This case having been duly submitted for decision and the Court, after due deliberation, having rendered a decision herein; now, in accordance with said decision, it is hereby

**ORDERED** that defendant-intervenor's, Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A., motion for partial judgment on the agency record is granted in part and this case is remanded to the Department of Commerce, International Trade Administration ("ITA") to add the full amount of VAT paid on each sale in the home market to FMV without adjustment and to develop a methodology which removes PSPAs and rebates paid on sales of out of scope merchandise from any adjustment made to FMV for PSPAs and rebates, or to deny such an adjustment if a viable method cannot be found; and it is further

**ORDERED** that the ITA's determination is affirmed in all other respects; and it is further

**ORDERED** that remand results are due within ninety (90) days of the date this opinion is entered, comments or responses by the parties to the remand results are due within thirty (30) days thereafter and any rebuttal comments are due within fifteen (15) days of the date responses or comments are due.

