The TIMKEN COMPANY, Plaintiff,

v.

UNITED STATES, Defendant,

Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A.; NSK Ltd. and NSK Corporation, Defendant–Intervenors.

Court No. 92–01–00031.
Slip Op. 94–107.

United States Court of International Trade.

July 1, 1994.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr., John M. Breen, Margaret E.O. Edozien, Amy S. Dwyer and Olufemi A. Areola, Washington, DC, for plaintiff.

Frank W. Hunger, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civil Div., U.S. Dept. of Justice, Velta A. Melnbrencis, of counsel: Joan L. MacKenzie, Attorney–Adviser, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Washington, DC, for defendant.

Powell, Goldstein, Frazer & Murphy, Peter O. Suchman, Susan P. Strommer, Niall P. Meagher, Robert A. Calaff and Susan M. Mathews, Washington, DC, for defendant-intervenors Koyo Seiko Co., Ltd. and Koyo Corp. of U.S.A.

Donohue and Donohue, Joseph F. Donohue, Jr., Kathleen C. Inguaggiato and Daniel W. Dowe, New York City, for defendant-intervenors NSK Ltd. and NSK Corp.

## OPINION

TSOUCALAS, Judge:

Plaintiff, The Timken Company ("Timken"), commenced this action to challenge certain aspects of the Department of Commerce, International Trade Administration's ("Commerce" or "ITA") final results of the administrative review of certain tapered roller bearings ("TRBs") from Japan. *Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Certain Components Thereof, From Japan; Final Results of Antidumping Duty Administrative Review* ("*Final Results*"), 56 Fed.Reg. 65,228 (Dec. 16, 1991).

## BACKGROUND

In 1976, the Treasury published a dumping finding, designated as T.D. 76–227, with respect to TRBs from Japan. *Tapered Roller Bearings and Certain Components From Japan,* 41 Fed.Reg. 34,974 (Aug. 18, 1976). In 1981, Commerce clarified T.D. 76–227 to cover only TRBs four inches or less in outside diameter, and certain TRB components. *Tapered Roller Bearings and Certain Components Thereof From Japan; Clarification of Scope of Antidumping Finding,* 46 Fed.Reg. 40,550 (Aug. 10, 1981).

In April 1991, Commerce published the preliminary results of its administrative review of TRBs covering the period August 1, 1988 through July 31, 1989. *Tapered Roller Bearings, Four Inches or Less in Outside Diameter, and Components Thereof, from Japan; Preliminary Results of Antidumping Duty Administrative Review,* 56 Fed. Reg. 14,924 (April 12, 1991).

In December 1991, Commerce published the final results of its administrative review

of TRBs covering the period August 1, 1988 through July 31, 1989. *Final Results,* 56 Fed.Reg. 65,228.

Timken moves pursuant to Rule 56.1 of the Rules of this Court for judgment on the agency record alleging that the following actions by Commerce were unsupported by substantial evidence on the administrative record and not in accordance with law: (1) use of a methodology for adjusting United States price ("USP") and foreign market value ("FMV") for Japan's consumption tax that granted a circumstance of sale ("COS") adjustment to FMV to achieve tax neutrality; (2) treatment of commissions alleged in the home market; (3) adjustment of FMV for pre-sale inland freight; (4) use of home market short-term borrowing rate in calculating inventory carrying cost; (5) failure to assess interest on underpayment of antidumping duties; and (6) treatment of antifriction bearings imported into foreign trade zones ("FTZ"). *Memorandum in Support of Plaintiff's Motion for Judgment on the Agency Record ("Timken's Memorandum")* at 12–55.

*Discussion*

The Court's jurisdiction over this matter is derived from 19 U.S.C. § 1516a(a)(2) (1988) and 28 U.S.C. § 1581(c) (1988).

■ A final determination by the ITA in an administrative proceeding will be sustained unless that determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B) (1988). Substantial evidence is "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938); *Alhambra Foundry Co. v. United States,* 12 CIT 343, 345, 685 F.Supp. 1252, 1255 (1988).

**1.** *COS Adjustment to FMV for Consumption Tax*

Pursuant to 19 U.S.C. § 1677a(d)(1)(C) (1984), Commerce added an amount to USP for the Japanese consumption tax levied on goods and services consumed domestically,

but not collected on exports from Japan. Commerce then made a COS adjustment to FMV to offset any difference in home market and U.S. tax under 19 U.S.C. § 1677b(a)(4) (1988). *Final Results,* 56 Fed.Reg. at 65,229.

Timken challenges Commerce's use of this methodology which grants a COS adjustment to FMV to achieve a tax neutral dumping margin. *Timken's Memorandum* at 12–15.

Defendant argues that its actions were supported by substantial evidence on the administrative record and otherwise in accordance with law. *Defendant's Memorandum in Partial Opposition to Plaintiff's Motion for Judgment Upon the Agency Record ("Defendant's Memorandum")* at 5–21.

For a more detailed discussion of defendant's arguments on this issue, see this Court's decision in *Torrington Co. v. United States,* 17 CIT ——, ——, 818 F.Supp. 1563, 1567–69 (1993).

■ This Court has fully addressed these arguments and adheres to its decision on this issue in *Federal–Mogul Corp. v. United States,* 17 CIT ——, ——, 813 F.Supp. 856, 863–65 (1993), wherein the Court held that, because tax neutrality is not a goal of 19 U.S.C. § 1677b(a)(4)(B) and because the difference in tax amounts in FMV and USP is not a difference in COS eligible for adjustment under that provision, FMV should not be adjusted for the alleged distortion to dumping margins from an addition to USP pursuant to 19 U.S.C. § 1677a(d)(1)(C). In oral argument, defendant acknowledged that the Appellate Court has sustained this Court's position on this issue and states that upon remand "Commerce will proceed to comply with the decisions." *Transcript of Oral Argument* at 18 (April 22, 1993). This Court remands this issue to Commerce to allow Commerce to add to USP the full amount of home market consumption tax waived or forgiven without a COS adjustment to FMV.

**2.** *Treatment of Koyo's Commissions*

In the final results, Commerce agreed with Koyo Seiko Co., Ltd. and Koyo Corporation of U.S.A. ("Koyo") that home market commissions should not be included in home mar-

ket indirect selling expenses, but should be treated as direct COS adjustments under 19 C.F.R. § 353.56(b) (1991). *Final Results,* 56 Fed.Reg. at 65,235.

Timken alleges that Koyo did not demonstrate that home market commissions were directly related to sales of the subject merchandise and as such, the ITA should have treated those expenses as indirect selling expenses, allowing an adjustment to foreign market value only under 19 C.F.R. § 353.-56(b)(2) (1991). Timken also claims that, even assuming Commerce correctly deducted commissions from Koyo's home market prices, Commerce improperly failed to apply the "commission offset" so that indirect selling expenses incurred in the U.S. would be deducted from exporter's sales price ("ESP") pursuant to 19 C.F.R. § 353.56(b)(1). Timken, therefore, alleges that Commerce's application of 19 C.F.R. § 353.56 in this case is contrary to the agency's prior practice and is based on an erroneous interpretation of its regulation. *Timken's Memorandum* at 15–22.

Koyo maintains its home market commissions were directly related to the subject sales and Commerce has verified Koyo's method of granting the commissions, declaring that the method reasonably relates the commission expense to subject sales. Koyo argues that it is unnecessary for Commerce to apply 19 C.F.R. § 353.56(b) at all, as it applies only where commissions are paid in one market "and no commission is paid in the other market under consideration." 19 C.F.R. § 353.56(b)(1). Koyo paid sales commissions in both the U.S. and home markets—although commissions were not paid on every single sale. Consequently, Commerce applied this regulation where the particular sales it was comparing did not each have a commission expense. Koyo further asserts that although Commerce was not required to apply this regulation, the manner in which the regulation was applied was reasonable. Koyo states that in the absence of explicit statutory guidance (as here), Commerce's interpretation of the statute should be given deference. *Defendant–Intervenor Koyo's Memorandum in Opposition to Plaintiff Timken's Motion for Judgment on*

*the Agency Record ("Koyo's Memorandum")* at 19–24.

■ Defendant agrees with Koyo's position that, when reviewing ESP sales, Commerce should treat them as directly related expenses for which COS adjustments are appropriate. Because the administrative record does not contain a sufficient explanation of Commerce's action, Commerce requests that the case be remanded to Commerce for reconsideration of its treatment of Koyo's commissions. *Defendant's Memorandum* at 21–23.

Section 353.56 provides for allowances in calculating foreign market value for bona fide differences in circumstances of sale. 19 C.F.R. § 353.56(a)(1). It limits allowances to "those circumstances which bear a direct relationship to the sales compared." *Id.* The regulation provides that the "[d]ifferences in circumstances of sale for which the Secretary will make reasonable allowances normally are those involving differences in commissions, credit terms...." 19 C.F.R. § 353.56(a)(2). 19 C.F.R. § 353.56(b) states:

(b) *Special Rule.* (1) Notwithstanding paragraph (a), the Secretary normally will make a reasonable allowance for other selling expenses if the Secretary makes a reasonable allowance for commissions in one of the markets under consideration and no commission is paid in the other market under consideration, but the Secretary will limit the amount of such allowance to the amount of the other selling expenses incurred in the one market or the commissions allowed in the other market, whichever is less.

(2) In comparisons with exporter's sales price, the Secretary will make a reasonable deduction from foreign market value for all expenses, other than those described in paragraph (a)(1) or (a)(2), incurred in selling such or similar merchandise up to the amount of the expenses, other that [sic] those described in paragraph (a)(1) or (a)(2), incurred in selling the merchandise.

In the preliminary results, Commerce treated the commissions reported by Koyo as indirect selling expenses. However, in the final results, Commerce changed its calculation to provide for a separate calculation of

the circumstance of sale adjustment for commissions and the ESP offset. *Final Results*, 56 Fed.Reg. at 65,235.

Commerce has requested that this issue be remanded for reconsideration of its treatment of Koyo's commission. As the administrative record does not contain a comprehensive explanation of the ITA's action, this matter is remanded to Commerce for reconsideration of its treatment of Koyo's commission. Commerce should limit COS adjustments to those expenses which bear a direct relationship to the sales compared as set forth in 19 C.F.R. § 353.56(a)(1).

### 3. *Pre-sale Inland Freight Adjustment to FMV*

The ITA adjusted FMV for home market pre-sale movement expenses incurred during the transport of merchandise from the factory to the warehouse or distribution center. *Final Results*, 56 Fed.Reg. at 65,233–34.

During the administrative review, Timken asserted that NSK Ltd. and NSK Corporation ("NSK") and Koyo reported their home market inland freight adjustment inaccurately and that Commerce should either recalculate or disallow this adjustment as a direct expense. *Final Results*, 56 Fed.Reg. at 65,-233.

Timken further claimed that Koyo's adjustment is inaccurate because it commingles pre-sale freight expenses incurred to move the product to warehouses or distribution centers with those incurred post-sale to ship the merchandise to its customers. *Id.*

Timken asserted during the administrative review that because NSK approximated freight expenses attributable to pre-sale transportation and because NSK could not directly isolate post-sale freight expenses in its accounting records, Commerce should decline to make any adjustment for pre-sale freight expenses and should treat the remainder of NSK's freight expense as an indirect selling expense. *Id.*

■ Timken now argues that treating home market pre-sale inland freight expenses as direct selling expenses is contrary to law. For support, Timken relies on 19 U.S.C. § 1677b(a)(4) (1980) and its legislative history which suggest that adjustments to FMV should be limited to selling expenses directly related to the sales under consideration. Timken argues that, as pre-sale freight expenses may not relate to a home market transaction, they should not be deducted as direct selling expenses. *Timken's Memorandum* at 23–29.

Commerce acknowledges that 19 U.S.C. § 1677a(d)(2)(A) requires that the ITA reduce USP by any expenses "incident to bringing the merchandise from the place of shipment in the country of exportation to the place of delivery in the United States." 19 U.S.C. § 1677a(d)(2)(A). Commerce regulations, contained in 19 C.F.R. § 353.41(d)(2)(i) (1991), similarly provide for an adjustment to USP for all movement expenses incurred on United States sales, regardless of when they are incurred. Thus, Commerce argues, the current antidumping duty law requires Commerce to deduct all movement expenses incurred, even those incurred prior to sale, on United States sales in order to establish the ex-factory price for sales comparison purposes. *Defendant's Memorandum* at 25–26. Pursuant to these provisions, the ITA must deduct all inland freight expenses incurred on U.S. sales in order to establish the ex-factory price for comparison to FMV. *Id.* However, no corresponding provision exists with regard to inland freight expenses incurred in the home market. *Defendant's Memorandum* at 23–28.

Commerce argues that by denying an adjustment for pre-sale inland freight expenses to FMV, Commerce essentially would compare an ex-factory price in the United States to an ex-warehouse price in the home market. By deducting pre-sale inland freight expenses from FMV in the home market, Commerce is able to compare U.S. ex-factory prices with their counterpart in the home market. *Id.*

Koyo and NSK agree with Commerce and urge this Court to affirm Commerce on this issue. *Koyo's Memorandum* at 23–26; *Response of NSK Ltd. and NSK Corporation in Opposition to Motion of The Timken Company for Judgment Upon the Agency Record* ("*NSK's Memorandum*"), at 10–14.

■ It is well-established that where Congress has included specific language in one section of a statute but has omitted it from another related section of the same act, it is generally presumed that Congress intended the omission. *Russello v. United States,* 464 U.S. 16, 23, 104 S.Ct. 296, 300–01, 78 L.Ed.2d 17 (1983).

The Court of Appeals for the Federal Circuit, in *Ad Hoc Comm. of AZ–NM–TX–FL Producers of Gray Portland Cement v. United States,* 13 F.3d 398, 401–02 (Fed.Cir.1994) stated:

> ... we believe that had Congress intended to deduct home-market transportation costs from FMV, it would have made that intent clear. FMV and USP are intimately related concepts, given full meaning only by their relationship to one another. The Antidumping Act revolves around the difference between the two. *See* 19 C.F.R. § 353.2(f)(1) (1993) (defining dumping margin with reference to USP and FMV). In slightly different forms, the USP provision, 19 U.S.C. § 1677a, and the FMV provision, 19 U.S.C. § 1677b, were passed together as part of the original Antidumping Act, 1921, ch. 14, 42 Stat. 11 (1921). From the Act's beginning, therefore, it is likely Congress has considered one only with reference to the other and has been well aware of any differences between them. That Congress included a deduction for transportation costs from USP but not from FMV leads us to conclude that Congress did not intend pre-sale home-market transportation costs to be deducted from FMV.

The *Ad Hoc Comm.* court, however, limited its decision to the calculation of FMV in purchase price situations only. *Id.* at 400. As it is not clear to this Court whether FMV was calculated in this case using purchase price or ESP, this Court remands this issue to the ITA to deny the adjustment to FMV for Koyo's and NSK's pre-sale home market transportation expenses only if FMV was calculated using purchase price.

### 4. *Inventory Carrying Cost*

In the preliminary results, the ITA calculated inventory carrying cost based on U.S. interest rates, but in the final results, the ITA recalculated the U.S. inventory carrying cost of NSK's U.S. subsidiary, NSK Corporation ("NSKC"), using NSK's short-term interest rate in Japan. *Final Results,* 56 Fed. Reg. at 65,236.

In the preliminary results, NSK had objected to Commerce's use of the U.S. short-term credit rate in the calculation of inventory carrying cost. Because NSKC had six months to pay for the imported merchandise, NSK argued that, as the parent company, it incurred the cost of keeping the goods in inventory for the subsidiary. NSK contended that because the time value of its funds was being measured, and because NSK would borrow at the lower rate in Japan according to reasonable commercial practice, Commerce should use the home market interest rate to impute the U.S. inventory carrying cost. Commerce agreed with NSK's position, stating:

> Normally, the Department calculates U.S. inventory carrying cost using the U.S. interest rate because the U.S. subsidiary bears the full cost of carrying the merchandise. However, as per *High Information Content Flat Panel Displays and Display Glass Thereof from Japan* (July 16, 1991, 56 FR 32399), if the payment terms that the parent extends to its subsidiary, in combination with the time the merchandise remains in the subsidiary's inventory, indicates that the parent bears the cost of carrying the merchandise for a portion of time the merchandise is in inventory, then the parent's short-term interest rate will be used to calculate that portion of the inventory carrying cost. Accordingly, we have recalculated NSKC's U.S. inventory carrying cost using NSK's short-term interest rate for the time that NSK bears the cost of carrying the inventory.

*Final Results,* 56 Fed.Reg. at 65,236.

■ Timken claims that Commerce has not "articulated any reasoned basis for departing from its well-established precedent" because the published determinations do not reveal, for example, whether the U.S. importers in question had access to foreign currency loans. *Timken's Memorandum* at 32.

Timken maintains that given the facts of this case, the ITA should use the U.S. borrowing rate to measure the cost of storing

merchandise in the United States by reference to the opportunity cost faced by the "exporter," NSKC. The ITA's use of the Japanese short-term rate for the portion of time the cost was allegedly borne by NSK is contrary to the purpose of imputing a credit expense, and is contrary to longstanding agency practice. Absent a reasonable basis for departing from that practice which has been affirmed by this Court, Timken argues, the ITA's determination here should be reversed and remanded. *Timken's Memorandum* at 34.

NSK states that all the time its goods were in inventory, NSKC had no "inventory carrying cost" because it had not paid for the goods. On the other hand, NSK, the parent company, bore the cost of maintaining the inventory in the United States. The ITA, therefore, properly calculated the cost using the credit rate in Japan. *NSK's Memorandum* at 15–17.

█ Pursuant to 19 U.S.C. § 1677a(e)(2) (1980), Commerce must make a reduction to ESP in the amount of any "expenses generally incurred by or for the account of the exporter." Contrary to Timken's assertion, the site or location at which the selling expenses are incurred is not determinative for making these adjustments under 19 U.S.C. § 1677a(e)(2). *Daewoo Elecs. Co. v. United States*, 13 CIT 253, 270, 712 F.Supp. 931, 948 (1989), *aff'd in part and rev'd in part*, 6 F.3d 1511 (Fed.Cir.1993).

Commerce having found that the Japanese parent company, NSK Ltd., bore the cost of maintaining the inventory in the United States, there is no reason why the U.S. subsidiary could not have benefitted from its parent's ability to borrow money in the home market at the home market interest rate. *LMI–La Metalli Industriale, S.p.A. v. U.S.*, 912 F.2d 455, 460–61 (Fed.Cir.1990). Having explained its actions, the Court finds that Commerce's adjustment of FMV for inventory carrying costs was reasonable and in accordance with law and is sustained.

### 5. *Interest on Underdeposit of Antidumping Duties*

Commerce did not hold Koyo and NSK liable for interest on underdeposits of antidumping duties assessed on entries of TRBs where they had not been ordered to make cash deposits. *Final Results*, 56 Fed.Reg. at 65,229.

█ Timken alleges that pursuant to 19 U.S.C. § 1677g (1984), Koyo and NSK are liable for interest on underpayments of amounts deposited to secure antidumping duties, regardless of whether the security was made in the form of bonds or cash. *Timken's Memorandum* at 35–45.

Defendant and defendant-intervenors argue that defendant-intervenors are not liable for interest on underdeposits of antidumping duties because payment of interest is tied to deposits and Koyo and NSK were not required to make estimated duty deposits upon their entries. *Defendant's Memorandum* at 32–34; *Koyo's Memorandum* at 27–29; *NSK's Memorandum* at 17–18. Commerce agrees, stating:

The only statutory authorization for assessing or paying interest on underpayments or overpayments of amounts deposited for antidumping duties in section 737(b), which provides that if the amount of an estimated antidumping duty deposited under section 736(a)(3) is different from the amount of the antidumping duty determined under an antidumping duty order issued under section 736, then the difference shall be (1) collected, to the extent that the deposit under section 736(a)(3) is lower than the duty determined under the order, or (2) refunded, the extent that the deposit under section 736(a)(3) is higher than the duty determined under the order, together with interest as provided by section 778. The amount of estimated antidumping duty deposited referred to in section 736(a)(3) is only a cash deposit, not a bond. See also, 19 CFR 353.24. Cash deposits were first required on entries of this merchandise manufactured by Koyo and NSK on June 1, 1990. Consequently, interest will only be collected or refunded on under or overpayments of cash deposits on entries after that date. The Department's interpretation has been upheld by the CIT (*Timken v. United States*, Slip Op. 91–95, October 25, 1991).

*Final Results*, 56 Fed.Reg. at 65,229.

This issue has already been ruled upon by this Court in *Timken Co. v. United States*, 16

CIT 999, 1001, 809 F.Supp. 121, 122–23 (1992) ("[19 U.S.C. § 1677g] is clear on its face that interest is collectable only on deposits and not on bonds"); *see also Timken Co. v. United States*, 15 CIT 526, 535, 777 F.Supp. 20, 27 (1991). This Court adheres to its decision in those cases. Therefore, Commerce's interpretation of the statutory scheme and decision not to impose interest in this case is sustained.

### 6. *Treatment of TRBs Imported into FTZs*

Commerce neither included TRBs admitted into a FTZ in this review nor required collection of antidumping duty deposits on the merchandise. *Final Results,* 56 Fed. Reg. at 65,228.

■ Timken asserts that Commerce should have included in this review all products within the scope of the finding which were admitted to a FTZ or subzone. Timken maintains that Commerce should require respondents to post cash deposits in the amount of the estimated antidumping duties upon all TRBs subject to the scope of this finding admitted to FTZs. *Timken's Memorandum* at 45–55.

Commerce disagrees, and states:

Under the Department's practice at the time the merchandise subject to this review was admitted into the FTZ the merchandise was not subject to antidumping duties. As we stated in the final results of review on Antifriction Bearings from the Federal Republic of Germany, et al. (56 FR 31703, July 11, 1991), and Tapered Roller Bearings Finished and Unfinished, and Parts Thereof from Japan (56 FR 41506, August 21, 1991), our understanding of the term "entry" in the antidumping law is that it unambiguously refers to release of merchandise into the customs territory of the United States. Importers were allowed to elect privileged status of TRBs admitted in FTZs. To the extent that TRBs were admitted into an FTZ in a nonprivileged status and transformed into merchandise not subject to the finding before entering U.S. customs territory, the Department currently has no basis for the assessment of antidumping duties on the merchandise.

*Final Results,* 56 Fed.Reg. at 65,228.

■ This Court has previously ruled on this issue and adheres to its decision in *Torrington Co.,* 17 CIT at ——, 818 F.Supp. at 1572 (1993); *see also Torrington Co. v. United States,* 17 CIT ——, ——, 826 F.Supp. 492, 494 (1993). This Court finds that the Foreign Trade Zone statute on its face exempts foreign merchandise within a FTZ from the imposition of antidumping duties and from being subject to an antidumping administrative review until that merchandise is brought into the U.S. customs territory, unless some other provision of the Foreign Trade Zone statute or the regulations promulgated thereunder require otherwise. *Torrington Co.,* 17 CIT at ——, 818 F.Supp. at 1572; *see also Torrington Co.,* 17 CIT at ——, 826 F.Supp. at 494. At the time of the imports in question, there was no statute or regulation that required that antidumping duties be imposed on merchandise imported into a FTZ or that such merchandise must be subjected to an antidumping administrative review until the merchandise entered U.S. customs territory.

Subsequent to the issuance of the final results at issue, the FTZ Board revised its regulations to provide that merchandise subject to an antidumping or countervailing duty order which enters the FTZ would be marked "privileged" and, thereby, subjected to antidumping and countervailing duty laws. *See* 15 C.F.R. § 400.33(b)(2) (1992).[1]

The merchandise here involved, having been imported into the FTZs as "nonprivileged" merchandise, was transformed in the FTZs into articles not covered by the antidumping duty order on TRBs, and is not subject to the antidumping order. Thus,

1. Section 400.33(b), which became effective April 6, 1992, provides the following:
   (b) *Restrictions on items subject to antidumping and countervailing duty actions*—(1) *Board policy.* Zone procedures shall not be used to circumvent antidumping (AD) and countervailing duty (CVD) actions under 19 CFR parts 353 and 355.
   (2) *Admission of items subject to AD/CVD actions.* Items subject to AD/CVD orders or items which would be otherwise subject to suspension of liquidation under AD/CVD pro-

Commerce's decision on this issue is affirmed.

*Conclusion*

In accordance with the foregoing opinion, this case is remanded to Commerce: to add to USP the full amount of the home market consumption tax waived or forgiven without a COS adjustment to FMV; to reconsider its treatment of Koyo's commissions while limiting COS adjustments to those commissions which bear a direct relationship to the sales compared; and to deny the adjustment to FMV for home market pre-sale freight expenses where FMV was calculated using purchase price. Commerce's determination is affirmed in all other respects.

Remand results are due within ninety (90) days of the date this opinion is entered. Any comments or responses are due within thirty (30) days thereafter. Any rebuttal comments are due within fifteen (15) days of the date responses or comments are due.

cedures, if they entered U.S. Customs territory, shall be placed in privileged foreign status (19 CFR 146.41) upon admission to a zone or subzone. Upon entry for consumption, such items shall be subject to duties under AD/CVD orders or to suspension of liquidation, as appropriate, under 19 CFR parts 353 and 355.